**ARBITRON INC., Plaintiff,**

v.

**TRALYN BROADCASTING, INC., JMD, Inc., d/b/a WLNF–FM/WROA–AM/ WZKX–FM/WGCM–AM–FM, Defendants.**

No. 01 Civ. 9652.

United States District Court, S.D. New York.

Dec. 4, 2007.

Dickstein Shapiro LLP, by Alfred R. Fabricant, Esq., Lawrence C. Drucker, Esq., Peter Lambrianakos, Esq., New York, NY, for Plaintiff.

Law Offices of Lawrence J. Bernard, Jr., Lawrence J. Bernard, Jr., Esq., Washington, D.C., for Defendant.

## OPINION

ROBERT W. SWEET, District Judge.

Plaintiff, Arbitron, Inc. ("Arbitron" or the "Plaintiff") has moved pursuant to Rule 56, Fed.R.Civ.P. for summary judgment granting the relief sought in its complaint against defendant Tralyn Broadcasting Inc. ("Tralyn" or the "Defendant") and JMD, Inc. ("JMD" or the "Defendants") d/b/a WLNF–FM/WROA–FM/WZKX–FM/WGCM–AM–FM (the "Stations"). For the reasons set forth below the motion is granted.

The contract action arises out of the unique services provided by Arbitron to radio stations throughout the country with respect to radio listening surveys. At issue is the propriety of the redetermination by Arbitron of its rate upon learning that station WLNF–FM had been acquired by JMD.

### Prior Proceedings

The complaint in this action was filed on November 1, 2001, and alleged damages suffered by Arbitron arising out of JMD's failure to pay the redetermined license fee for its services after JMD acquired station WLNF–FM pursuant to the license previously entered into with the station.

By an opinion filed on June 9, 2003, *Arbitron, Inc. v. Tralyn Broad., Inc.*, 269 F.Supp.2d 264 (S.D.N.Y.2003), the JMD motion for summary judgment dismissing the complaint was granted on the grounds that Paragraph 11 was impermissibly vague.

Upon appeal, the Court of Appeals vacated the grant of summary judgment, stating that the Agreement "delegated,

with unmistakable clarity, price-setting authority to [Arbitron], and that New York law does not invalidate such contracts." *Arbitron, Inc. v. Tralyn Broad., Inc.*, 400 F.3d 130, 131 (2d Cir.2005). "On remand, the district court may wish to consider whether Arbitron has exercised its authority [to redetermine] in 'good faith' within the meaning of N.Y. U.C.C. § 2–305 ... or more generally, in a manner consistent with Arbitron's implied duty of fair dealing under New York law." *Id.* at 138.

After remand, discovery was completed and action is currently ready for trial. The instant motion by Arbitron was heard on June 6, 2007.

### The Facts

The facts are set forth in the Local Civil Rule 56.1 statements of Arbitron and JMD.[1] The facts are not in material dispute except as noted.

According to Arbitron, the undisputed material facts are:

Two valid and enforceable contracts (the "Agreements") exist between Arbitron and former-defendant Tralyn concerning radio station WLNF–FM (formerly WLUF–FM).

JMD acquired control over the programming and advertising of WLNF in September 1999 and completed its acquisition of the station in February 2000, assuming the Agreements with Arbitron and paying the license fees due under those Agreements at the single station rate of $1,779.57 per month from October 1999 through June 2000.

By letter dated June 28, 2000, Arbitron notified JMD that it had learned of the change of control of WLNF and that, pursuant to paragraph 11 of the Station Li-

---

1. The JMD statement pursuant to Local Civil Rule 56.1(b) did not challenge the facts as set forth above by Arbitron but instead added certain additional facts which according to JMD require trial as well as arguments with respect to the rate escalations.

cense Agreement to Receive and Use Arbitron Radio Listening Estimates ("Station License Agreement"), Arbitron would redetermine the rates charged to JMD to reflect the fact that JMD owned four other stations in the relevant market.

Paragraph 11 of the Station License Agreement provides, in pertinent part, as follows:

> Station agrees that if at any time it changes or has changed its ownership, operating or sales policy, frequency, broadcasting arrangements, group or business relationships of the station(s) licensed under this Agreement, or if it enters or has entered into any management or other business relationship with another radio station in this Market or an adjacent Market, or if it enters or has entered into any joint operating agreement with one or more other radio stations, or if it is or was purchased or controlled by an entity owning or otherwise controlling other radio stations in this Market or an adjacent Market [,] ... Station and its radio station(s) will report the change and the effective date thereof to Arbitron within thirty (30) days of such change. In the event of such occurrence, Station further agrees that Arbitron may redetermine its Gross Annual Rate for the Data, Reports, and Services licenses hereunder, as well as any Supplementary Services, effective the first month following the date of the occurrence.

Arbitron performed its obligations under the Agreements by providing WLNF–FM the Arbitron ratings book and services from the beginning of the contract term through at least July 2000.

An invoice dated August 1, 2000 in the amount of $20,438.77 was sent to JMD seeking license fees for its four originally-owned radio stations from April 2000 through July 2000, and the redetermined rate for all five JMD radio stations for August 2000. JMD was not billed for WLNF–FM for the months of April 2000 through July 2000 because JMD had already made those payments. From September 2000 through March 2001, Arbitron sent JMD invoices reflecting the higher, redetermined multi-station rate.

JMD made no payments under the Agreements after July 2000. After JMD failed to make further payments, Arbitron suspended service to JMD.

On April 5, 2001, Arbitron sent a letter to JMD advising that if JMD did not pay the past due amount, Arbitron would commence suit to recover the entire amount due under the Agreements, which includes unbilled amounts which Arbitron may accelerate under paragraph 5(a) of the Station License Agreement.

The material facts which JMD contends requires trial are:

On May 26, 2005, Arbitron sent JMD interrogatories asking JMD to describe evidence supporting JMD's defense "that the rates charged by Arbitron ... were too high", JMD's "claim" that Arbitron's rates were "not calculated in good faith," and JMD's claim that the rate was "arbitrary."

On February 7, 2006, Arbitron filed in this action an opposition to JMD's motion to compel response to discovery, stating:

> There is but one remaining issue for trial on JMD's liability for breach of contract—whether Arbitron acted in good faith in re-determining the subscription fees after JMD's radio group expanded from one station to five stations.
>
> .    .    .    .    .
>
> Arbitron's relationships with its subscribers and its negotiations for licensing its data and services are highly confidential and sensitive. This information is proprietary not to Arbitron but also to the radio stations, advertising agencies

and other present, former and prospective subscribers who have or may have a business relationship with Arbitron. Indeed much of the information which JMD seeks in discovery includes pricing and other confidential information about JMD's head-to-head competitors in the very markets where JMD does business. Arbitron's subscribers would be outraged if JMD had access to information.

During discovery in this action, Arbitron sought and, on February 9, 2006, this Court issued, an order, which granted the right to restrict the dissemination of documents produced in discovery pursuant to Fed.R.Civ.P. 2(c)(7) if Arbitron claimed that such documents constituted or contained trade secrets or other confidential, proprietary, development or commercial information. During discovery, Arbitron claimed the right to protect disclosure of more than 100 pages of documents containing information relating to the rates it charged radio stations for its services.

On July 3, 2003, Arbitron moved for reconsideration of this Court's Memorandum Opinion of June 5, 2003, granting, in part, JMD's motion for summary judgment, and attached to its moving papers a declaration from Patricia O'Donnell ("O'Donnell"), an Arbitron vice. O'Donnell's declaration contained the following statements:

> Arbitron calculates its subscription rates for its license agreements pursuant to a rate card for the specific market at issue based on the number of radio stations in the applicable geographical market owned by the licensee. (p.3, para.5)

> .        .        .        .        .

> [T]he amount of the gross annual license fee set forth in the Agreement (Exh. C) was determined pursuant to Arbitron's rate card for the Greater Biloxi–Gulfport market based upon the fact that the license was being granted to a single station which would receive two (2) of the four (4) books which Arbitron publishes each year in that market.

> .        .        .        .        .

> Arbitron regularly updates and revises its rates to reflect market conditions and changes in each of the markets throughout the United States. In June of 2000, when Arbitron discovered that JMD had acquired WLNF and that JMD owned or controlled four other unlicensed radio stations in Greater Biloxi–Gulfport market, Arbitron exercised its contractual right to re-determine the license fees in accordance with ¶ 11 of the Agreement pursuant to the then current rate card for the Greater Biloxi–Gulfport market. The new license fees ... were set in accordance with the then current rate card based upon the fact that the licensee would receive two ratings books each year for the remainder of the Agreement; the fact that the market at issue was the Greater Biloxi–Gulfport market; and the additional fact that the licensee would now own or control five stations in the subject market instead of one station. The new multi-station rate also entitled the licensee to certain specific discounts which are expressly set forth in ¶¶ 3 and 16 resulted in a new monthly license fee of $5,784.93 to cover all five stations. The initial contract rate had been $1,779.57 for a single station license.

> .        .        .        .        .

> If permitted the opportunity to testify at the trial of this action it would be my testimony that the increased rates which Arbitron calculated under ¶ 11 of the Agreement and invoiced to JMD in June 2000 were consistent with the then current rate card; with Arbitron's long standing practices and procedures for determining rate increases under ¶ 11 of similar agreements; and. with other rates charged to other radio station sub-

scribers in the Greater Biloxi–Gulfport market at that time. Moreover, the increased rates invoiced to JMD in June 2000 are consistent with the single station rate set forth in the Agreement of $1,779.57 per month increased to include four additional unlicensed stations in the same market less the applicable discounts.

On February 1, 2006, JMD moved for an order requiring Arbitron to produce for inspection and copying several different categories of documents, including,

All Arbitron "rate cards" (as described in declarations of Patricia O'Donnell dated April 16 and June 27, 2003 in this case), and all other documents that refer or relate to such rate cards for each market listed in document request 4 above, proposed or issued from 1995 to present.

Arbitron subsequently produced to JMD a number of documents, but did not include any rate cards. When counsel for JMD informally asked Arbitron counsel why no rate cards had been produced, counsel replied that JMD's counsel would have to ask an Arbitron principal for that information at a deposition. JMD opted not to take any depositions in this action.

Arbitron has included a declaration by Julian Davis ("Davis") in support of the summary judgment motion now at issue in this action. Davis, an employee of Arbitron, stated that in July of 2000, he calculated the new rate which Arbitron charged JMD following JMD's acquisition of WLNF–FM. Davis's version of the calculation process differs from O'Donnell's description of the same process. In contrast to O'Donnell's claim that the rate was derived by reference to a rate card, one station figure which was then multiplied by five the number of stations JMD controlled and then reduced by applicable discounts, Davis does not assert that he gave any consideration at all to a rate card when he calculated the new five station rate in June of 2000. Instead, he claims that he first looked to the rate contained in an August 1998 Arbitron contract for other stations controlled by a JMD principal. He then claims to have employed a rather complicated process of multiplying that rate by escalation percentages, adding the costs of other services and determining a rate for half of the year. He asserts that he then adjusted that rate by a standard escalator, to determine a four station rate for the previously owned JMD stations for the remaining years of the Arbitron/Tralyn contract, and added in the amounts specified in the original agreement for one station for the years remaining after the sale to JMD to determine a new rate for all five stations.

Arbitron grants multiple station owners such as JMD a reduced annual rate if they employ a single general manager and a single sales staff. JMD received such a discount in 1998 when it acquired WGCM AM/FM. However, there is no indication in Davis's declaration that calculations of the five station rate Arbitron charged JMD in 2000 included such a discount.

Other materials attached to Davis's declaration also conflict with O'Connelly's claim that the rate Arbitron assessed against JMD was determined by obtaining a single station rate from a rate card, multiplying it by five and subtracting applicable discounts. In fact, the available documentation seems to indicate that either Arbitron does not set a "single station rate" for each market or, if there is such a rate, it was not routinely used in setting the rates in contracts. For example, the rate charged for WROA in the 1998 contract was $1,623.00 while the rate for WZKX was $21,564. The WGCM–AM rate charged for the 1998 contract was "$0" while that for WGCM–FM was $7,729. Similar disparities appear in other

contracts produced in discovery. In December of 1997, only eight months before the August 1998 Agreement calling for a $16,695 rate for one book was entered into, Arbitron offered JMD's stations a one book rate of $12,521. In December of 1998, Arbitron gave the licensee of WMJY–FM in the Gulfport area a one book rate of $3,750 per year. In October of 1997, Arbitron gave WJZD–FM in the Gulfport area a one book rate of $4,545.00 per year. In December of 1998, Arbitron gave the licensee of WKNN–FM in the Gulfport area a one book rate of $3,750 per year.

Other documents produced by Arbitron in discovery also indicate that Arbitron has agreed to substantive changes in parts of its standard contract which: do not involve rates. For example, it agreed with Clear Channel Radio, Inc., the licensee of hundreds of radio stations, to delete the escalation clause in paragraph 11 of its standard agreement, the same paragraph on which Arbitron relies to support its claim that it may charge more than three times the amount set forth in the original contract.

The following material facts are not disputed:

- Tralyn entered into licensee agreements with Arbitron to which Tralyn was obligated to pay license fees to Arbitron.
- JMD entered into an operating agreement with Tralyn in September 1999 under which JMD began providing programming to and selling advertising for WLNF–FM.
- Also pursuant to the operating agreement, JMD reimbursed Tralyn for the monthly license fee of $1,779.57 required under the two license agreements with Arbitron at issue in this case from September 1999 through February 2000.
- In October 1999, JMD and Tralyn entered into an Asset Purchase Agreement for the sale of WLNF–FM to JMD.
- The Asset Purchase Agreement provided that Tralyn's license agreements with Arbitron would be assigned to JMD.
- On or about February 29, 2000, WLNF–FM was sold to JMD.
- JMD continued to make payments to Arbitron under the license agreements for WLNF–FM through July 2000.
- In total, JMD paid the sum of $19,575.27 for services under the WLNF–FM license agreements.
- In or about July, 2000, Arbitron notified JMD that pursuant to paragraph 11 of the Station License Agreement with WLNF–FM, it would seek payment of the higher, multiple-station rate.
- On or about August 1, 2000, Arbitron issued the first of its invoices reflecting the higher, redetermined rate.
- JMD never made any payments under the Arbitron license agreements beyond the $19,575.27 paid through July 2000.

### The Summary Judgment Standard

In deciding a motion for summary judgment, a court shall render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000).

The moving party has the initial burden of showing that there are no material facts in dispute, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the non-moving party's case, *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. New York*, 762 F.2d 243, 249 (2d Cir.1985). However, the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If there is not, summary judgment is proper. *See id.* at 249–50, 106 S.Ct. 2505.

"Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case." *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994) (internal quotation marks, citation, and brackets omitted).

### Arbitron is Entitled to Summary Judgment on the Contract Claim

■ "Under New York law, an action for breach of contract requires proof of: (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Hold-*ings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir.1994) (citing *Bank Itec N.V. v. J. Henry Schroder Bank & Trust Co.*, 612 F.Supp. 134, 137–38 (S.D.N.Y.1985)).

The only potential issue for this Court to determine before granting Arbitron judgment was suggested by the Second Circuit on remand, i.e., whether Arbitron acted in good faith when it redetermined the rate charged to JMD pursuant to paragraph 11 of the Station License Agreement.

■ Pursuant to Fed.R.Civ.P. 8(c), an affirmative defense must be pleaded. A defendant is required to plead and adequately develop an affirmative defense during pretrial proceedings so that a district court can determine which claims, if any, may be disposed of by summary judgment. *See, e.g., Kerman v. City of New York*, 374 F.3d 93, 111–12 (2d Cir.2004). Should a defendant fail to plead an affirmative defense, the general rule is that the defense is waived. *See id.; Travellers Int'l, A.G. v. Trans World Airlines*, 41 F.3d 1570, 1580 (2d Cir.1994).

However, JMD has noted that since "[u]nder New York law, every contract contains an implied covenant of good faith and fair dealing," *Arbitron*, 400 F.3d at 139 (citation omitted), the issue was raised by the filing of Arbitron's complaint and JMD's Answer, which contained a Third Affirmative Defense that Arbitron breached the contract which is the subject of this lawsuit by improperly raising its rates to JMD. Arbitron seemed to acknowledge as much when it sent JMD interrogatories inquiring into (a) JMD's contentions that the rates Arbitron charged JMD were too high; (b) JMD's "claim" that Arbitron's rates were not calculated in "good faith"; and (c) JMD's claim that the rate was "arbitrary."

As the Second Circuit observed in *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995),

The function of pleadings under the Federal Rules is to give fair notice of the claim asserted. Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.

(quoting 2A *Moore's Federal Practice* ¶ 8.13, at 8–58 (2d ed.1994)).

The issue of good faith as framed by the Court of Appeals is an appropriate issue on this motion.

Whether the duty to exercise good faith is rooted in New York common law or in the U.C.C., similar standards apply. N.Y.U.C.C. § 2–305 provides, in pertinent part, that "[a] price to be fixed by the seller or by the buyer means a price for him to fix in good faith." (McKinney 2007). Official Comment 3 provides that "[g]ood faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant." *Id.* Courts addressing the issue of whether a price was set in good faith pursuant to N.Y.U.C.C. § 2–305 have not found that such an issue presents questions of fact that bars summary judgment. *See, e.g., Yonaty v. Amerada Hess Corp.,* 2005 WL 1460411, *7, 2005 U.S. Dist. LEXIS 22429, at *21 (N.D.N.Y. June 20, 2005) (granting summary judgment and finding that no genuine issue as to good faith existed).

In surveying treatment of the "good faith" standard of U.C.C. § 2–305, the *Yonaty* court concluded that most, though not all, courts required a showing of bad motive such as a desire to prevent the other party "from receiving [their] reasonably expected fruits under the contract." 2005 WL 1460411, *5, 2005 U.S. Dist. LEXIS 22429, at *15 (brackets in original). All of the surveyed courts were in agreement that a plaintiff "must produce some evidence of improper motive, discriminato-

ry pricing, or the pricing practices of other franchisees" in order to make out a claim of bad faith. *Id.,* 2005 WL 1460411, *5, 2005 U.S. Dist. LEXIS 22429, at *17.

█ "[T]he implied covenant of good faith and fair dealing only precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." *Rexnord,* 21 F.3d at 526 (citation and internal quotation marks omitted). As the party asserting a violation of the duty to exercise good faith and fair dealing, the burden is on JMD to prove that Arbitron sought to prevent JMD from enjoying the fruits of the Agreements. *See id.; see also Kader v. Paper Software, Inc.,* 111 F.3d 337, 342 (2d Cir.1997) (dismissing a claim for breach of duty where there was no proof that the alleged acts of bad faith intentionally and purposely prevented the other party from carrying out the terms of the agreement).

█ Davis was the individual who actually calculated the redetermined rate for JMD under the license agreements. According to his affidavit, the redetermined rate was comprised of two components: the existing rates for WLNF–FM, and new rates to be calculated for JMD's four originally-owned radio stations, which were WROA–AM, WZKX–FM and WGCM–AM/FM. (Davis Decl. ¶ 9.) As a starting point for calculating the new rate for JMD's four originally-owned stations for the remaining six months of the October 1999 contract year, Davis used the rate that JMD had paid under a previous license agreement with Arbitron for the Spring 1998 Book for two of its stations, WROA–AM and WZKX–FM. (*Id.* ¶ 15.) Davis increased that rate by 8%, Arbitron's standard annual escalator and the same escalator JMD's previous Arbitron license agreements provided, to arrive at the license fee for the Spring 2000 Book. (*Id.*) The license fees for the remaining

products were calculated using Arbitron's standard multipliers based on the Spring 2000 Book fee, or in the case of the Map-Maker product, standard rates charged by Arbitron. (*Id.* ¶ 16.) The new rate for April 2000 through September 2000 was thus calculated as $3,731.83 per month, which when added to the existing rate for WLNF–FM, $1,779.57, yielded the redetermined rate of $5,511.11. (*Id.*)

The new rate for JMD's four originally-owned stations for the contract year beginning in October 2000 was determined by doubling the rate for all licensed products except the MapMaker product for the previous six-month period (since double the reports and products would generally be provided) and then applying the standard 8% annual escalator. (*Id.* ¶ 17.) The new rate for the October 2000 contract year was $3,865.17 per month, which when added to the existing rate for WLNF–FM for this period, which was $1,919.76, yielded the redetermined rate $5,784.93 per month. (*Id.*)

Finally, the new rate for JMD's four originally-owned stations for the contract year beginning on October 2001 was determined by applying the 8% annual escalator to all of the previous year's fees except the Sample Size Increase Surcharge. (*Id.* ¶ 18.) Thus, the new rate for JMD's four originally-owned stations was $4,169.17 per month, which when added to the existing rate for WLNF–FM for this period, which was $2,071.20, yielded the redetermined rate of $6,240.36 per month. (*Id.*)

JMD has not submitted evidence to raise a triable issue that the redetermined rate was calculated in bad faith. The new rates for JMD's four originally-owned stations were based on a license rate that JMD had agreed to in a prior license agreement for two of its radio stations. (*Id.* ¶¶ 10–11.)

The previously agreed-upon rate for the Spring 1998 Book was for a license to only two of JMD's stations: WROA–AM and WZKX–FM. Arbitron's decision to essentially give WGCM–AM/FM free access to its reports and products does not evidence bad faith by Arbitron.

When increasing the Spring 1998 Book rate to arrive at the Spring 2000 Book rate, Arbitron applied the 8% annual escalator only once, even though the Spring 2000 Book was released two years later. (*Id.* ¶ 18.) This discount resulted in savings to JMD.

JMD has contended that for a license rate to be enforceable as reasonable, it must be a market price. JMD has conceded that Arbitron's rate setting procedures are a trade secret, and no evidence has been presented to establish a market price. It appears from this record that Arbitron's survey procedures and reports are unique.

In response to JMD's argument that the re-determined license rate is not enforceable unless it is a reasonable price that is a market price, Arbitron submitted the Reply Declaration of Davis ("Davis Reply Decl.") which stated that the re-determined license rate which he calculated himself was reasonable and fair to JMD, and that based upon his experience in setting license rates and based on his analysis of license agreements for other radio stations operating in the same market or region as JMD's stations, the re-determined rate assessed to JMD was not only reasonable, but was at the low end of the range of rates charged in comparable agreements. (Davis Reply Decl. ¶ 4.)

Davis explained his analysis as follows: To create a fair basis for comparison of license rates, he divided the annual local market report ("LMR") license fee for a given licensee by the number of LMRs provided per year and also by the number of stations covered by the license. (*Id.* ¶ 5.) The result was the license rate for

each LMR received by each station covered under the license agreement. (*Id.*) Davis then performed this calculation for twelve license agreements in effect in the same region as JMD's five stations, and compared those rates to JMD's per LMR per station rate. (*Id.* ¶ 6.) Davis also prepared an average per LMR per station rate for these twelve licensees and the three licensees cited by JMD in its papers. (*Id.* ¶¶ 8–9.) According to Davis, JMD's re-determined rate of $5,717 per LMR per station was at the low end of the range of rates paid by each station for each LMR. (*Id.* ¶ 7.) In fact, twelve of the fifteen rates analyzed were higher than JMD's rate, and the average rate paid by the other stations, $10,129.42, was significantly higher than JMD's rate of $5,717. (*Id.* ¶¶ 6, 9.)

The only evidence offered by JMD were the three license agreements attached as Exhibits B through D of JMD's Local Civil Rule 56.1 statement. However, these three contracts were included by Davis in his analysis of fifteen license agreements presented to the Court, which include rates on average more than 40% higher than JMD's re-determined rate. (Davis Reply Decl. ¶ 9.)

JMD has offered no evidence to establish that Arbitron exercised its authority with the objective of interfering with JMD's ability to realize the fruits of the Agreements, or that Arbitron discriminated against JMD when establishing the re-determined rate. Davis stated that he discounted the re-determined rate in an effort to foster a strong relationship with JMD and to keep JMD as a satisfied customer in the long term. (Davis Decl. ¶ 22.) Davis discounted the new rate and in effect licensed one of the five stations for free. (*Id.* ¶ 19.)

Moreover, the pricing information before the Court shows that Arbitron assessed a relatively low re-determined rate that was favorable to JMD as compared to the prices paid by other radio stations for rate books in the same region. (Davis Reply Decl. ¶¶ 6–7.) Even when the three contracts offered by JMD are considered alongside the twelve contracts offered by Arbitron, the re-determined rate is thousands of dollars per LMR per station less than the average rate paid by the other licensees. (*Id.* ¶ 9.)

JMD has contended that a good faith price under U.C.C. § 2–305(2) is a "market price," which JMD then defines as the fair market value of the goods sold. The cases cited by JMD, including *Carey Lithograph Co. v. Magazine & Book Co.*, 70 Misc. 541, 127 N.Y.S. 300 (N.Y.App. Term 1911), and *Kondrup v. Assessor of Binghamton*, 3 A.D.3d 625, 770 N.Y.S.2d 451, 453 (N.Y.App.Div.2004), merely define the term "fair market value" without regard to the definition of a good faith price under U.C.C. § 2–305(2), and without stating that a good faith price under U.C.C. § 2–305(2) is a market price. Neither the cases cited by JMD nor the principle of fair market value is discussed by the court in *Yonaty*, as JMD has contended. In fact, the *Yonaty* court noted that a commercially reasonable price under U.C.C. § 2–305(2) has not been defined as the fair market price or the lowest price available by some courts. *See* 2005 WL 1460411, *5, 2005 U.S. Dist. LEXIS 22429, at *15–16. Another case relied on by JMD, *A.M. Webb & Co. v. Robert P. Miller Co.*, 157 F.2d 865 (3d Cir.1946), which states that an open price term is deemed to be the "market price," relies on a statute, N.Y. Personal Property Law, § 90(4), which was superseded by the Uniform Commercial Code.

Nevertheless, even if JMD's re-determined rate must have been a "market price" to be enforceable, the evidence has established that JMD's re-determined rate per LMR station was actually below the

average rate of fifteen other, similar agreements, including three license agreements that JMD offered to the Court in opposition to this motion. (Davis Reply Decl. ¶ 9.)

JMD also has contended that the discrepancy between the O'Donnell and Davis declarations regarding the method of calculating the re-determined rate creates an issue of fact as to whether JMD's rate was re-determined in good faith. The manner in which the rate was calculated does not create an issue of material fact that precludes summary judgment where the re-determined rate is favorable as compared to other rates in effect in the market. Davis is the person who performed the actual calculations. O'Donnell, an in-house attorney for Arbitron, set forth her best understanding at the time of how the rate was re-calculated. To the extent that JMD now argues that O'Donnell erroneously stated that the re-calculated rate was based on the "rate card," Davis has affirmed that the "rate card" pricing did in fact form the basis of the original contract price for the four JMD stations which were added to the license agreement in July 2000. (Davis Reply Decl. ¶¶ 15–17.)

Nor has JMD presented facts that the re-determined rate was imposed with the intention of preventing JMD from performing under the Agreements in violation of the implied covenant of good faith and fair dealing. *See Rexnord*, 21 F.3d at 526. Nothing in the Dowdy Declaration has raised a genuine issue of fact as to whether Arbitron re-determined the rate to procure JMD's breach.

JMD has contended that the re-determined rate was unreasonable because Dowdy was not given an opportunity to negotiate the new rate. However, the Second Circuit held that a contract provision which allows one party to unilaterally re-determine the price term in the future is not unenforceable as a matter of law. *See Arbitron*, 400 F.3d at 131.

According to the Joint Pretrial Scheduling Order, JMD's case at trial will consist primarily of documents which will be introduced through Arbitron's witnesses. JMD had the opportunity to take depositions, which it did not do, and to hire an expert witness in the industry, which it also chose not to do. That being the case, it appears that JMD has now presented in opposition to this motion everything it will produce at trial in support of its bad faith defense and in defense of Arbitron's claim for breach of contract. Since those documents and the Dowdy Declaration fail to raise a genuine issue of material fact as to whether the re determined rate was determined in good faith, there is no need to conduct a bench trial to hear the same evidence again.

*Conclusion*

For the reasons stated above, the motion of Arbitron for summary judgment is granted.

Submit judgment on notice.

It is so ordered.