# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1065
_____

Northern Bottling Co., Inc.

*Plaintiff - Appellant*

v.

Pepsico, Inc.

*Defendant - Appellee*

------------------------------

Independent Bottlers Association; Pepsi-Cola Bottlers' Association

*Amici on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the District of North Dakota - Bismarck

_____

Submitted: March 17, 2021
Filed: July 22, 2021

_____

Before COLLOTON, GRUENDER, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

Northern Bottling Co., Inc. ("Northern") brought claims against Pepsico, Inc. ("PepsiCo"), alleging that PepsiCo failed to protect Northern's interests under their

exclusive bottling contracts. The district court[1] granted summary judgment to PepsiCo, concluding that the contracts between the parties did not expressly require PepsiCo to protect against certain shipments of PepsiCo's products into Northern's territory. We affirm.

## I. Background

PepsiCo sells carbonated beverages. For many years, PepsiCo has relied on a network of local, independent bottlers tasked with purchasing syrup from PepsiCo, manufacturing and bottling the carbonated beverages, and selling and distributing the carbonated beverages to retail purchasers.

Each independent bottler executes a generic bottling contract with PepsiCo, outlining the bottler's territory and PepsiCo's specifications for production. The bottling contracts require the bottler to purchase syrup for the carbonated beverages from PepsiCo and give the bottler exclusive rights to distribute PepsiCo products within its assigned geographic territory.

Northern joined PepsiCo's network of independent bottlers in 1955. Northern's original territory included several counties in North Dakota, but was later expanded to include additional counties in both North and South Dakota. Northern estimates that it services more than 2,000 customers.

Northern's initial bottling contract was for Pepsi-Cola; however, over the course of Northern's more than sixty-five-year relationship with PepsiCo, Northern has acquired bottling contracts for additional PepsiCo products. Each product is governed by its own bottling contract, and the bottling contracts at issue on appeal are Northern's contracts pertaining to Pepsi-Cola, Diet Pepsi, Mountain Dew, and Diet Mountain Dew. The bottling contracts contain choice-of-law provisions stating that disputes arising from the contracts are governed by New York law.

---

[1]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

"Transshipping" in this context occurs when carbonated beverage products from one bottler's territory are transported and sold in another bottler's exclusive territory. Transshipment often occurs when, after the initial delivery of product from a bottler to a retailer, the retailer re-sells the product to a separate distributor. That distributor might then transport and sell the products in another bottler's territory. This problem often negatively impacts an independent bottler's bargained-for rights under its bottling contracts. PepsiCo has faced decades of litigation over its efforts to battle transshipping. However, none of the bottling agreements mention transshipment or include any language requiring PepsiCo to prevent transshipment of competing products into Northern's territory.

In 1980, Congress passed the Soft Drink Interbrand Competition Act, which reinforced soft drink companies' ability to control the manufacture, sale, and distribution of their products. *See* 15 U.S.C. § 3501 *et seq.* In response to the Soft Drink Act, PepsiCo developed the "PepsiCo Transshipment Enforcement Program" ("TEP"), which created a process by which PepsiCo investigated and fined bottlers whose product had been transshipped. Under the TEP, if a bottler suspects that products have been transshipped into its territory, it can report the offense to PepsiCo. PepsiCo then assigns an independent investigator to verify the presence of transshipped products in the complainant's territory. If a violation is discovered, the TEP requires the offending bottler to pay a fine, which would then be credited to the victim bottler, as well as the costs of the investigation. A customer that is the source of transshipped product could face penalties ranging from a warning to suspension or termination of its ability to purchase PepsiCo products.

Northern claims its problems with transshipping greatly increased in 2010 when PepsiCo purchased many of its independent bottlers and created the Pepsi Bottling Company, a subsidiary of PepsiCo. After this vertical integration, PepsiCo owned approximately 80% of its own bottling and sales capacity. This altered the interests of the market participants, which Northern claims impacted PepsiCo's enforcement of the TEP.

Northern alleges that since the formation of the Pepsi Bottling Company, PepsiCo has been causing or allowing transshipment to take place without protecting the interests of its independent bottlers. Northern also alleges the PepsiCo product transshipped into its territory increased from fewer than 1,000 transshipped cases of product between 2008 and 2010 to 6,500 cases in 2015. Northern admits that around 2015, it had pricing disputes with some of its customers. And, around that time, a company named Core-Mark, who obtained Pepsi Bottling Company products from brokers, began selling PepsiCo products to its own customers within Northern's territory. During the pricing dispute, four of Northern's customers stopped purchasing products from Northern and began purchasing products from Core-Mark.

Northern reported Core-Mark to PepsiCo on multiple occasions. In response, PepsiCo investigated, determined the identity of the source bottlers, assessed and collected fines from each such bottler, and then credited those payments to Northern. PepsiCo also sent a cease-and-desist letter to Core-Mark regarding its unauthorized sales in Northern's territory. PepsiCo also tracked down the customers who were the source of the product that eventually ended up in Core-Mark's hands, and PepsiCo sanctioned them.

Northern sued PepsiCo in 2015, alleging causes of action for breach of the bottling contracts and tortious interference with the bottling contracts, among other claims. PepsiCo moved for summary judgment. The district court granted PepsiCo's summary judgment motion. The district court reasoned that since the express terms of the bottling contracts did not create a duty for PepsiCo to take any steps to prevent transshipping, Northern's claims failed as a matter of law. Northern appeals.

## II. Discussion

We review *de novo* a district court's grant of summary judgment. *Guardian Fiberglass, Inc. v. Whit Davis Lumber Co.*, 509 F.3d 512, 515 (8th Cir. 2007). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id*. "When

reviewing a grant or denial of summary judgment, we consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.* (cleaned up) (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1200 (8th Cir. 1999)).

## A. New York Common Law

We must first decide what law governs Northern's breach of contract claim: New York common law or New York's Uniform Commercial Code ("UCC"). "Federal district courts sitting in diversity . . . must apply the forum state's substantive law, including its conflict of law rules." *Guardian*, 509 F.3d at 515. North Dakota law "honor[s] choice-of-law provisions" in contracts, and it is undisputed that the terms of the bottling contracts state that New York law governs any conflict arising from the contracts. *Chapman v. Hiland Partners GP Holdings, LLC*, 862 F.3d 1103, 1108 (8th Cir. 2017); *accord Am. Hardware Mut. Ins. Co. v. Dairyland Ins. Co.*, 304 N.W.2d 687, 689 n. 1 (N.D. 1981) ("Parties may stipulate as to choice of law.").

The analysis of whether PepsiCo owed a duty to prevent transshipping differs depending on whether New York common law or the UCC applies. In short, if New York common law applies to this dispute—as the district court believed—then PepsiCo did not breach the bottling agreements. Alternatively, if we conclude that the UCC applies to the bottling agreements, then Northern has a stronger argument that PepsiCo had a contractual duty to prevent transshipping.

PepsiCo asserts that Northern has waived its argument regarding the applicability of the UCC because Northern did not raise it before the district court. We agree.

It is well settled that a party's failure to raise an argument before a trial court typically waives that argument on appeal. *Heuton v. Ford Motor Co.*, 930 F.3d 1015, 1022 (8th Cir. 2019) ("Absent exceptional circumstances . . . we cannot consider issues not raised in the district court." (quoting *Platte Valley Bank v. Tetra Fin. Grp.*,

*LLC*, 682 F.3d 1078, 1086 (8th Cir. 2012))).  Here, Northern failed to argue for application of the UCC before the district court.  Not only that, but when PepsiCo attacked the Tenth Circuit's application of New York's UCC in a case involving nearly identical PepsiCo bottling agreements, Northern responded by arguing that New York common law allowed the same result implicated by the UCC even in a contract not governed by the UCC.  *Pepsi-Cola Bottling Co. of Pittsburg v. PepsiCo, Inc.*, 431 F.3d 1241, 1256 n. 7 (10th Cir. 2005).

Northern argues against waiver by claiming that its citation to the *Pepsi-Cola Bottling Co. of Pittsburgh* case throughout its response, and the district court's decision to address the Uniform Commercial Code versus common law issue in its decision, shows that its UCC argument was squarely before the district court and thus not waived.  We find Northern's argument unpersuasive.  Happening to cite to a case involving the same issue without developing an argument is not enough to preserve an issue for appeal.[2]

Northern was obligated to challenge the application of New York common law in its response to PepsiCo's motion for summary judgment.  It cannot rely on the district court's analysis of the issue to preserve arguments it failed to raise.  We conclude that all of the arguments arising out of Northern's suggested application of the UCC also fail, and we uphold the district court's application of New York common law.

---

[2]On appeal, Northern argues that the district court failed to properly analyze this issue under the *Erie* doctrine.  Because we conclude that Northern waived its UCC arguments, we need not move forward with an *Erie* analysis.

## B. Breach of Contract

### 1. New York Common Law

Applying New York common law, it is evident PepsiCo did not owe a duty to prevent transshipping under the express terms of the bottling contracts, and, therefore, Northern's breach claim fails as a matter of law.

It is undisputed that the plain terms of the bottling contracts do not create an express duty for PepsiCo to prevent transshipping of products into Northern's territory. "New York follows the common law rule that, in interpreting a contract, the intent of the parties governs, and therefore a contract should be construed so as to give full meaning and effect to all of its provisions." *Novamedix, Ltd. v. NDM Acquisition Corp.*, 166 F.3d 1177, 1181 (Fed. Cir. 1999) (cleaned up and quotation omitted); *accord W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document . . . is generally inadmissible to add to or vary the writing.").

"In interpreting a contract, '[w]ords and phrases are given their plain meaning. Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement.'" *Novamedix*, 166 F.3d at 1181 (quotation omitted). "[W]hether contract provisions are ambiguous is a question of law . . . ." *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 89 n. 9 (2d Cir. 2013). "[W]here 'the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law,' and a claim turning on that interpretation may thus be determined by summary judgment or by dismissal." *Novamedix*, 166 F.3d at 1181 (quotation omitted). Thus, because we apply New York common law and focus on the express terms of the bottling agreements, we conclude PepsiCo had no duty to prevent transshipping of products into Northern's territory.

## 2.  Covenant of Good Faith and Fair Dealing

"[U]nder New York law, every contract contains an implied covenant of good faith and fair dealing," and the duty to exercise good faith and fair dealing can be rooted in both New York common law and the UCC.  *Arbitron Inc. v. Tralyn Broad., Inc.*, 526 F. Supp. 2d 441, 447–48 (S.D.N.Y. 2007).  "New York courts have repeatedly affirmed that a party may be in breach of an implied duty of good faith and fair dealing, even if it is not in breach of its express contractual obligations, when it . . . deprive[s] the other party of the fruit of its bargain."  *Duration Mun. Fund, L.P. v. J.P. Morgan Sec. Inc.*, 2009 WL 2999201, at *6 (N.Y. Sup. Ct. Sept. 16, 2009) (unpublished).  But, "[a] claim of implied duty of good faith and fair dealing cannot create new duties under a contract or substitute for an insufficient contract claim."  *Duration*, 2009 WL 2999201, at *7; *accord Lehman Bros. Int'l (Europe) v. AG Fin. Prod., Inc.*, 2013 WL 1092888, *2 (N.Y. Sup. Ct. Mar. 12, 2013) (unpublished) ("[T]he covenant of good faith and fair dealing cannot be construed so broadly as to effectively nullify other express terms of the contract, or to create independent contractual rights." (citation omitted)).

A claim for the breach of the covenant of good faith and fair dealing is not "a substitute for a nonviable breach of contract claim."  *Triton Partners LLC v. Prudential Sec. Inc.*, 752 N.Y.S.2d 870, 870 (N.Y. App. Div. 2003).  "[T]he implied covenant of good faith and fair dealing only precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement."  *Arbitron*, 526 F. Supp. 2d at 448 (alteration in original) (quotation omitted).  The covenant "merely brings to light implicit duties to act in good faith already contained, although not [] specified in the contract. . . .  [F]or the implied duty of good faith and fair dealing to stand as a cause of action, there must be an underlying contractual obligation between the parties."  *Duration*, 2009 WL 2999201, at *7.

Even if PepsiCo was bound to avoid conduct that would deprive Northern of its benefits under the EBA with PepsiCo, Northern's claim that PepsiCo breached the implied duty of good faith and fair dealing cannot survive summary judgment.  There is no dispute of material fact with respect to PepsiCo's conduct, and a

reasonable factfinder could not find that PepsiCo engaged in conduct that deprived Northern of its benefits under the EBA. PepsiCo implemented and enforced the TEP even though it was not required to do so under the plain terms of the bottling agreements. And, Northern does not dispute that PepsiCo followed up on Northern's complaints against Core-Mark or that PepsiCo reprimanded the offending bottlers who were the source of products that went to Core-Mark. PepsiCo's enforcement of the TEP demonstrates that it acted in good faith to protect Northern's territory under the bottling agreements. However, those actions do not manifest or arise out of an implied duty to prevent transshipping. We conclude that Northern cannot rely on an implied duty to create obligations that are not expressly included in the bottling contracts, and that duty cannot provide a basis for Northern's breach of contract claim.

### 3. Alleged Factual Disputes

Northern argues the district court erred in finding that there was no genuine dispute of material fact on its breach of contract claim because the magistrate judge assigned to this matter found that there were issues of fact. Without the parties' consent, magistrate judges cannot issue binding decisions on dispositive motions. *See Roell v. Withrow*, 538 U.S. 580, 585 (2003); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980). Furthermore, the discovery orders Northern clings to are clearly interlocutory orders, not decisions on the merits. *See Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 830 (8th Cir. 2008) ("[A] discovery ruling is 'clearly' an interlocutory decision." (citing *FirsTier Mortg. Co. v. Invs. Mortg. Ins. Co.*, 498 U.S. 269, 276 (1991))). Thus, Northern's argument that the magistrate judge's rulings create issues of fact fails.

Because the bottling agreement is unambiguous and fails to confer a contractual duty on PepsiCo to prevent transshipping, and given Northern's inability to establish that PepsiCo owed a duty to prevent transshipment of products into Northern's territories, there is no genuine dispute of material fact and Northern's breach of contract claim was properly disposed of on summary judgment.

## C. Tortious Interference

Finally, Northern argues that the district court erred in granting summary judgment on its tortious interference claim because (1) in the event that Northern's breach of contract claim fails, its tort claim survives, and (2) the issue of causation was properly reserved for a jury.

Both parties agree that North Dakota law governs Northern's tort claim.

[I]n order to prevail on a claim for unlawful interference with business, a plaintiff must prove the following essential elements: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an independently tortious or otherwise unlawful act of interference by the interferer; (4) proof that the interference caused the harm sustained; and (5) actual damages to the party whose relationship or expectancy was disrupted.

*Lochthowe v. C.F. Peterson Estate*, 692 N.W.2d 120, 126 (N.D. 2005) (quoting *Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc.*, 628 N.W.2d 707, 717 (N.D. 2001)). "It is not enough for a plaintiff to show a mere possibility that he would have obtained some economic benefit in the absence of a defendant's interference . . . . Rather, the plaintiff must show he would have obtained the economic benefit in the absence of the interference." *Carlson v. Roetzel & Andress*, No. 3:07–cv–33, 2008 WL 873647, at \*13 (D.N.D. Mar. 27, 2008) (unpublished) (internal citations omitted).

Northern's tort claim immediately fails because its tort allegations are rooted in the contractual dispute between it and PepsiCo. *Van Sickle v. Hallmark & Assocs., Inc.*, 744 N.W.2d 532, 540 (N.D. 2008) ("[I]f the defendant's conduct . . . would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract.").

Northern argues that its tort claim arises not from the contract, but from PepsiCo's failure to prevent transshipping. Northern contends its customers knew that transshipped goods were widely available for purchase within Northern's territory, which allowed the customers to jump ship from Northern to Core-Mark (for a while). We are unpersuaded. Not only does this argument fail to connect PepsiCo to Northern's alleged injury, but the undisputed facts show that PepsiCo took reasonable steps to educate its customers against transshipment.

The undisputed record demonstrates that PepsiCo took reasonable measures to enforce the TEP and to prevent transshipment of products into Northern's territory. Northern does not dispute PepsiCo's representations that it investigated each of Northern's complaints against Core-Mark and that it followed the procedures set forth in the TEP by tracking down the source of the transshipped products and sanctioning the customers responsible for selling-off their purchased PepsiCo products. We therefore agree with the district court that PepsiCo is entitled to judgment as a matter of law on Northern's breach of contract claim. Therefore, we agree with the district court that no genuine dispute of material fact exists as to Northern's tort claim. Accordingly, we uphold the district court's award of summary judgment on Northern's tortious interference claim.

### III. Conclusion

The judgment of the district court is affirmed.

_____