# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-2292

_____

In re: Pawn America Consumer Data Breach Litigation

------------------------------

Melissa Thomas, on behalf of herself individually and on behalf of all others
similarly situated; Randell Huff; Megan Murillo; Monique Derr; Paola Manzo

*Plaintiffs - Appellees*

v.

Pawn America, Minnesota, LLC; Payday America, Inc.; PAL Card Minnesota,
LLC

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: December 14, 2023
Filed: July 11, 2024

_____

Before ERICKSON, MELLOY, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

This case is about what it takes to waive a contractual right to arbitration. Here, three companies spent months litigating in federal court before moving to compel arbitration. The district court[1] concluded that, by then, they had waived the right by "*substantially* invoking the litigation machinery." *Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080, 1087 (8th Cir. 2021) (emphasis added). We reach the same conclusion.

I.

Sometime in September 2021, cybercriminals targeted a chain of pawnshops, a payday lender, and a prepaid-card company. During the attack, they uncovered customers' personal information, including full names, addresses, birth dates, and social-security numbers. Several weeks later, the companies alerted customers about the data breach, which prompted the filing of three nationwide class-action lawsuits in the District of Minnesota.

After agreeing to consolidate the cases, the companies moved to dismiss. They claimed that the customers lacked standing, *see* Fed. R. Civ. P. 12(b)(1), and that the complaint did not state a claim, *see id.* 12(b)(6). Nothing about arbitration. *See* 9 U.S.C. § 3.

Nor did they raise it over the next couple of months. Instead, the companies fully briefed the issues raised in their motion to dismiss, prepared a joint discovery plan, and requested a pretrial conference.

There is disagreement about what happened next. The companies insist that they orally requested a stay of discovery during the pretrial conference and promised to file a motion to compel arbitration. The customers, on the other hand, deny that the companies gave notice of their intent to arbitrate. Unfortunately, there is no

---

[1]The Honorable Patrick J. Schiltz, Chief Judge, United States District Court for the District of Minnesota.

recording or transcript of the proceedings, which the magistrate judge conducted by teleconference.

The only other clues about what happened came from the magistrate judge's docket entry and the order staying discovery. The former summarized what happened, and the latter expanded on it by discussing "the significant issues raised as to [the customers'] standing." Delaying discovery was the answer, at least until the district court had a chance to decide whether to grant the motion to dismiss. Still no mention of arbitration.

Several weeks later, the district court held a hearing on the motion to dismiss. Despite allegedly promising at the pretrial conference that a motion to compel "would be forthcoming," the companies had yet to file one. Arbitration did not come up during the hour-long hearing, not even once.

Two more months passed before the companies finally gave formal notice of their intent to arbitrate. The customers protested, so they rushed to file a motion before the parties entered mediation. They acknowledged that "timeliness may be an issue," because the customers thought the companies "ha[d] waived the[ir] right."

Following a hearing on the motion, the district court agreed. In the court's view, the companies "ha[d] no credible explanation for why, if [they] had determined [at the pretrial conference] that [they were] going to compel arbitration, [they] sat on [their] hands . . . only to decide [three months later] that it was urgent that [they] act to protect [the] right to arbitrate. That ma[de] no sense." We must decide whether their conduct during the delay amounted to waiver. *See* 9 U.S.C. § 16(a)(1)(A) (allowing an appeal to "be taken from . . . an order . . . refusing a stay").

## II.

We have previously addressed what it takes to waive arbitration. *See, e.g.*, *McCoy v. Walmart, Inc.*, 13 F.4th 702, 703–04 (8th Cir. 2021); *Sitzer v. Nat'l Ass'n of Realtors*, 12 F.4th 853, 856–57 (8th Cir. 2021); *Hooper v. Advance Am., Cash Advance Ctrs. of Mo., Inc.*, 589 F.3d 917, 920–24 (8th Cir. 2009); *Kelly v. Golden*, 352 F.3d 344, 349–50 (8th Cir. 2003). This time is different, however, because of the Supreme Court's recent decision in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022). Our initial task is to determine its impact, if any, on our existing three-part test, which asks whether the party seeking arbitration (1) knew of the right; (2) acted inconsistently with it; and (3) "prejudice[d] the other party [with its] inconsistent acts." *McCoy*, 13 F.4th at 704 (second alteration in original) (citation omitted).

*Morgan* makes clear that we can no longer consider prejudice. The focus of waiver, after all, is on "the actions of the person who held the right," not "the effects of those actions on the opposing party." *Morgan*, 596 U.S. at 417; *see Breadeaux's Pisa, LLC v. Beckman Bros. Ltd.*, 83 F.4th 1113, 1117 (8th Cir. 2023). Given that focus, the question boils down to whether a party has "intentional[ly] relinquish[ed] or abandon[ed] . . . a known right." *Morgan*, 596 U.S. at 417 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

"Stripped of its prejudice requirement," the remainder of our existing test answers that question. *Id.* at 419 (noting that our "current waiver inquiry" otherwise properly "focus[es] on" the right-holder's conduct). So there is no reason to strip our test down to the studs and start over.

Nor does framing our test this way violate the Supreme Court's prohibition on "arbitration-specific procedural rules." *Morgan*, 596 U.S. at 419. Although *Morgan* requires us to "treat[] arbitration contracts like all others," it does not prevent us from translating garden-variety waiver principles into specific litigation contexts. *Id.* at 418; *see, e.g.*, *Bd. of Regents of the Univ. of Wis. Sys. v. Phx. Int'l Software, Inc.*, 653 F.3d 448, 458 (7th Cir. 2011) (listing the kinds of litigation

conduct that "waive . . . sovereign immunity"); *Phx. Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) (noting that "consciously deciding to participate in . . . litigation may constitute an implied waiver of [foreign sovereign] immunity"); *Knowlton v. Allied Van Lines, Inc.*, 900 F.2d 1196, 1199 (8th Cir. 1990) (explaining that objections to personal jurisdiction "may be waived[] . . . by not asserting them in a timely manner"). Focusing on litigation conduct zeroes in on the most relevant conduct without "tilt[ing] the playing field in favor of (or against) arbitration." *Morgan*, 596 U.S. at 419.

To the extent the companies argue that state rather than federal waiver principles apply, they failed to make that argument before the district court. *See St. Paul Fire & Marine Ins. Co. v. Compaq Comput. Corp.*, 539 F.3d 809, 824 (8th Cir. 2008). In fact, if anything, they suggested otherwise during the motion-to-compel hearing, when counsel argued that the customers had not "met the[ir] burden of waiver under the *federal* jurisprudence." (Emphasis added). It is too late to change their position now. *See N. Bottling Co. v. Pepsico, Inc.*, 5 F.4th 917, 922–23 (8th Cir. 2021); *see also Cont'l Res., Inc. v. Fisher*, 102 F.4th 918, 930 (8th Cir. 2024) (describing the invited-error doctrine).

In sum, our pre-*Morgan* three-part test now has two parts, but otherwise remains the same. To evaluate whether a party has "intentional[ly] relinquish[ed] or abandon[ed]" the right to arbitration, *Morgan*, 596 U.S. at 417 (citation omitted), courts must determine whether it (1) knew of its "existing right" and (2) acted "inconsistently with" it, *McCoy*, 13 F.4th at 704 (citation omitted). *See Schwebke v. United Wholesale Mortg. LLC*, 96 F.4th 971, 974 (6th Cir. 2024) (applying the rest of the court's "pre-*Morgan* caselaw"); *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 460 (9th Cir. 2023) (explaining how *Morgan* "removed prejudice . . . as an element of waiver in the context of arbitration" but "the body of caselaw . . . applying the[] [other] two elements remain[ed] good law"). And one way to act inconsistently with it is to "substantially invok[e] the litigation machinery rather than promptly seek[] arbitration." *McCoy*, 13 F.4th at 703 (citation omitted).

-5-

III.

That is exactly what the companies did. *See id.* at 704 ("Our review is de novo, but we examine any underlying factual findings for clear error."). They all but admit to having knowledge of their contractual right to arbitrate long before they formally raised it. Their position, after all, is that it came up during the pretrial conference. Yet it is undisputed they took no further action until months later, after the hearing on the motion to dismiss.

The district court, for its part, thought the companies knew even earlier: as soon as customers signed the contracts they drafted. From that point on, under the doctrine of constructive knowledge, they are presumed to know what was in them.[2] Claiming ignorance of a contract's contents is rarely a recipe for success. *See Parler v. KFC Corp.*, 529 F. Supp. 2d 1009, 1014 (D. Minn. 2008); *see also Messina v. N. Cent. Distrib., Inc.*, 821 F.3d 1047, 1050 (8th Cir. 2016) (holding that a party "knew of its existing right to arbitration because it possessed the arbitration agreement"). It is even more of an uphill battle when the party claiming ignorance is the one who drafted it. *See Erdman Co. v. Phx. Land & Acquisition, LLC*, 650 F.3d 1115, 1118 (8th Cir. 2011) (reasoning that the right-holding party's knowledge was "obvious from the fact that [it], a sophisticated party . . . , drafted the [c]ontract containing detailed . . . arbitration provisions, and is presumed to know its contents"); *Se. Stud & Components, Inc. v. Am. Eagle Design Build Studios, LLC*, 588 F.3d 963, 968 (8th Cir. 2009) (similar).

In any event, when the companies learned of their arbitration right is less important than what they did afterward. In the three months following the pretrial conference, they participated in an hour-long motion-to-dismiss hearing, stipulated

---

[2]Setting aside the practical difficulties that would accompany an actual-knowledge requirement, it is rarely (if ever) a condition of waiver. One example is when a party fails to raise an argument in an opening brief. In those circumstances, there has been a waiver regardless of what the party knew at the time. *See United States v. Greene*, 513 F.3d 904, 906–07 (8th Cir. 2008).

-6-

to a discovery plan, and scheduled a mediation, which "are hardly the actions of [litigants] trying to move promptly for arbitration." *Sitzer*, 12 F.4th at 857 (citation omitted). By any measure, their actions "substantially invoke[d] the litigation machinery." *Donelson*, 999 F.3d at 1087 (citation omitted).

Consider the proceedings surrounding the motion to dismiss. Although the companies "focused on more than just the merits" by raising standing, they also sought "immediate and total victory" by arguing that the complaint failed to state a claim. *McCoy*, 13 F.4th at 704 (citation omitted). Only after they had a chance to preview the district court's thinking did they begin to push for arbitration, with mediation only a week away. Just in time to use the threat of arbitration as a powerful bargaining chip. *See Sitzer*, 12 F.4th at 856 ("If there was a possibility that the case would end in federal court, [the companies were] uninterested in switching to arbitration."); *see also Hooper*, 589 F.3d at 922 (calling this sort of gamesmanship "the worst possible reason for failing to move for arbitration sooner" (citation omitted)).

We recognize that the chaos caused by the ransomware attack may have made the circumstances more difficult. But even if it took the companies "considerable time and effort" to locate the contracts, they have yet to explain why they "sat on [their] hands" for several months afterward. *See McCoy*, 13 F.4th at 705 (citation omitted) (requiring parties "to do all [they] could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration"). "Having followed this course, [they] must now live with the consequences." *Sitzer*, 12 F.4th at 857.

IV.

We accordingly affirm the district court's order.

_____

-7-